UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.  1:22-CR-65 |
| | ) | |
| JONATHON B. EASON | ) | |

## RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Stacey R. Speith, Assistant United States Attorney, and files this Response to Defendant's Motion to Dismiss. In his motion, the Defendant contends that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him based upon *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022).  This Court should deny the Motion.

### *Background*

Defendant Jonathon Eason is charged in a single count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  The Indictment alleges that in 2021, Eason was previously convicted in Allen County, Indiana, for Intimidation and Strangulation, felonies, in 02D05-2103-F5-112. (R. 1)

## I.   LEGAL BACKGROUND

### A.   *Bruen's* "Text and History" Test.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the

Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Court cautioned that the right "is not unlimited" and remains subject to "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626, 627 n.26. Two years later, the Supreme Court "repeat[ed] [the] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

In *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment protects the right of "law-abiding citizens with ordinary self-defense needs" to keep and bear arms. 142 S. Ct. 2111, 2156 (2022). *Bruen* struck down a New York law requiring residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home. *Id.*

Under the Supreme Court's new two-step analysis, *Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129-30. If the conduct is covered, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. There are two avenues of historical inquiry, with the first being a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id*. at 2131. Here, courts should pinpoint evidence of "a distinctly similar historical regulation addressing that problem." *Id*.  The second method of inquiry is by "analogy" since "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."

*Id.* The central considerations are whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified. *Id.* at 2132-33; *see also id.* at 2133 ("how and why the regulations burden a law-abiding citizen's right to armed self-defense"). This "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original). The modern-day regulation need not be a "dead-ringer," only analogous enough to pass constitutional muster. *Id.* at 2133.

### B.   Under *Bruen's* Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional

In *Bruen*, six Justices emphasized that certain firearms regulations—including longstanding prohibitions on felons' possession of firearms—remain constitutional. In his concurrence, Justice Alito explained that *Bruen* did not "disturb anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157 (cleaned up). Justice Kavanaugh, joined by Chief Justice Roberts, reiterated that longstanding prohibitions on the possession of firearms by felons remain constitutional. *Id.* at 2162. *See also id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

Consistent with these assertions, post-*Bruen*, nearly every federal court to consider the issue has concluded that § 922(g)(1) remains constitutional. Judges on this Court have unanimously agreed. *See, e.g., United States v. Crawford*, 2023 WL 5559031 (N.D. Ind. 2023) (Simon, J.); *United States v. Cummings*, 2023 WL 3023608 (N.D. Ind. 2023), *United States v. Braster*, 2023 WL 2346282 (N.D. Ind. 2023), and *United States v. Clark*, 2023 WL 2346284 (N.D. Ind. 2023) (Brady, C.J.); *United States v. Rice*, 2023 WL 2560836 (N.D. Ind. 2023)

(DeGuilio, J.); *United States v. Tribble*, 2023 WL 2455978 (N.D. Ind. 2023) (Simon, J.; *United States v. Kenneth Young,* 2023 WL 8697936 (N.D. Ind. 2023) (DeGuilio, J.).  In two opinions issued recently, this Court has again confirmed that, applying *Bruen's* test, the plain text of the Second Amendment does not protect felons and that, even if it did, § 922(g) aligns with this nation's history and tradition of firearms regulation.  *United States v. Drake*, 1:23-CR-21 (docket entry 39, at 4) (N.D. Ind. Nov. 16, 2023) (Brady, C.J.); *United States v. Brady*, 1:22-CR-47 (docket entry 27, at 4-6) (N.D. Ind. Nov. 13, 2023) (Brady, C.J.).

The first federal appeals court to consider this question found § 922(g)(1) constitutional. *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). *Jackson* explained that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-dispossession laws, and "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" and who are "deemed more dangerous than a typical law-abiding citizen." *Id.* at 501-06.  Citing scholarly works, law review articles, and various historical laws, the Eighth Circuit concluded that there was no need for felony-by-felony litigation. *Id.* at 502.  "[H]istory demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons. Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 504.

The Ninth Circuit also recognized a "history and tradition of regulating the possession of firearms" in holding U.S.S.G. §2D1.1(b)(1) constitutional. *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th 2023). *Alaniz* found "a longstanding tradition of enhancing a defendant's

sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes," and "drug trafficking fits squarely within that category of crimes." *Id.* at 1130. *See also United States v. Hickcox*, 2023 WL 3075054, at *1 (5th Cir. 2023) (on plain-error review, rejecting *Bruen*-based challenge to § 922(g)(1)'s constitutionality); *United States v. Garza*, 2023 WL 4044442, at *1 (5th Cir. 2023) (same). This Court similarly upheld the dangerous weapon enhancement as constitutional because *Bruen* itself "is rife with historical observations" excluding from Second Amendment protections those individuals whose possession of firearms would endanger public safety. *United States v. Love*, 2022 WL 17829438 at *4 (N.D. Ind. 2022) (Brady, C.J.).

The government is aware of only a few outliers. First, in *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023) (en banc), the Third Circuit found § 922(g)(1) unconstitutional as applied. *Range* "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. It held that "the Government has not shown that our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms." *Id.* at 106 (emphasis added). *Range* emphasized that its "narrow" holding applied "only" to Range "given his violation of" a Pennsylvania misdemeanor false statements statute. *Id.* A misdemeanor false statements conviction is quite different from Eason's serious felony convictions.

Second, in *United States v. Bullock*, a Mississippi district court granted a motion to dismiss a § 922(g)(1) charge brought by a defendant whose predicate offenses included aggravated assault and manslaughter. 2023 WL 4232309, at *2 (S.D. Miss. 2023). *Bullock* held that the government had "failed to establish a historical tradition supporting lifetime criminalization of [defendant's] possession of a firearm." *Id.* at *31. That ruling too was

limited to the specific defendant. *Id.*

Recently, the Seventh Circuit in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), remanded an as-applied challenge to § 922(g)(1) brought in a civil matter by a plaintiff with a felony mail-fraud conviction "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id.* at 1020. The Seventh Circuit ordered the government further to "develop its contention that the plain text of the Second Amendment does not protect felons" and "conduct a more substantial historical analysis." *Id.* at 1020-24.  Notably, *Bruen* was decided *after* the district court decided this case; as a result, the district court had applied the Seventh Circuit's pre-*Bruen* analysis and did not conduct the historical analysis that *Bruen* now requires.  *Id.* at 1021-22. This case was remanded because "[t]he parties' briefing does not grapple with *Bruen*."  *Id.* at 1022.

In dissent in *Atkinson*, Judge Wood explained that she would have upheld § 922(g)(1). *Id.* at 1018-38. Noting that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations," Judge Wood concluded that "text, history, and tradition all point in the same direction: firearms have always been regulated in precisely the ways that concern us in the third decade of the 21st century." *Id.* at 1030, 1033. More specifically, she explained that "since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed." *Id.* at 1035. Like those statutes, § 922(g)(1) "identifies the group of persons deemed dangerous to the political community—those convicted of the defined felonies—and it makes it unlawful for them to possess a firearm." *Id.* at 1036. "The Supreme Court's guidance satisfies me that the Court recognizes that certain across-the-board

disqualifications from gun ownership have always been part of the U.S. approach to gun regulation and thus have the kind of historical support that *Bruen* demands." *Id.* at 1027.

## II.   ARGUMENT

Under *Bruen*'s "text and history" test and in agreement with the Court's recent opinions in *Drake* and *Brady*, § 922(g)(1) remains a permissible restriction on firearms possession because felons do not fall within the textual purview of the Second Amendment. Even if they did, § 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and punishing felons through capital punishment and estate forfeiture.

### A.   The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment.

Felons do not fall within "the people" protected by the Second Amendment, and their "right . . . to keep and bear Arms" is thus not "infringed" by laws prohibiting their possession of firearms. Rather, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community." *Heller*, 554 U.S. at 580.

Legislatures historically have had wide latitude to exclude felons from the political community based on their convictions. In his "massively popular 1868 Treatise on Constitutional Limitations," Thomas Cooley recognized "an individual right" to keep and bear arms "unconnected with militia service." *Heller*, 554 U.S. at 616. Yet even Cooley recognized that "the people in whom is vested the sovereignty of the State. . .cannot include the whole population," and "[c]ertain classes have been almost universally excluded," including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A*

*Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons therefore could historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights," including the right to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms." Akhil Reed Amar, *The Bill of Rights* 48, 48 (1998).

Committing a felony today often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury), and *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement); *see also, Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting consequences of felony conviction can include deprivation of the right to hold office). Section 922(g)(1) thus accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in part); *see also id.* (describing lifetime gun-possession ban on felons as "historically grounded and sensible"). *See also*, *e.g.*, *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (historically felons were excluded from the right to arms because they were deemed unvirtuous); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("In classical republican philosophy, the concept of a right to arms was inextricably

and multifariously tied to that of the virtuous citizen, such that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals).”); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (“Most scholars of the Second Amendment agree that the right to bear arms was inextricably. . .tied to the concept of a virtuous citizenry that would protect society through defensive use of arms against criminals” and “the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).”).

Supreme Court precedents confirm this view. *Heller* upheld the “right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U.S. at 635. Parsing the Second Amendment, the Court recognized that the plaintiff was entitled to keep a handgun in his home “[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights.” *Id.* at 635. *See also id.* at 631 (explaining the District had “apparently” used the word “disqualified” to “mean if [the plaintiff] is not a felon and is not insane”).

*Bruen* did not deviate from *Heller's* principle that the right to bear arms belongs only to “law-abiding, responsible citizens.” 142 S. Ct. at 2131. It characterized the holders of Second Amendment rights as “law-abiding” citizens no less than 14 times. *Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156.  Further confirming that this was not mere dicta, “[t]his notion is reiterated *twice* in the two opening sentences of the decision and in over a dozen other instances in the majority opinion, including the final paragraph summarizing the Court’s holding.”  *Crawford*, 2023 WL 5559031 at *4 (Simon, J.).   And while *Bruen* invalidated New York’s “may-issue” licensing regime, it approved “shall-issue” regimes that “require applicants to undergo a background check or pass a firearms safety course.” *Id.* at 2138 n.9. The Court explained that shall-issue regimes, many of which prohibit the issuance of licenses to felons, generally pass constitutional muster

because they "are designed to ensure only that those bearing arms. . .are, in fact 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment presumptively protected felons from disarmament. The frequency with which *Bruen* employed the phrase "law abiding, responsible citizens"—rather than broadly referencing "the people" or "all Americans"—strongly indicates that this was a deliberate choice of language that should be afforded due weight. *See Jackson*, 69 F.4th at 403 (in upholding § 922(g)(1), emphasizing "the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms"); *Crawford*, 2023 WL 5559031 at *4 (rejecting defense position regarding the law-abiding language as mere dicta and finding that "any claim that convicted felons are law-abiding citizens would be an unreasonable interpretation of what the Supreme Court has repeatedly said.") (Simon, J.). This Court has agreed, saying "[t]he use of the phrase 'law-abiding' hardly seems unintentional." *Drake*, 1:23-CR-21 (D.E. 39, at 8).

Nothing in *United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015), alters this analysis. In *Meza-Rodriguez,* the court stated that although some of the language used in *Heller* linked Second Amendment rights with notions of "law-abiding citizens," those passages did not, themselves, define the term "people." *Id.* at 669. But as *Atkinson* itself acknowledged, *Meza-Rodriguez* lacked the benefit of *Bruen's* repeated use of the phrase "law-abiding citizens." *See Atkinson*, 70 F.4th at 1023. This Court has agreed in the most recent opinion. *Drake*, 1:23-CR-21 (D.E. 39, at 7). In short, the Second Amendment's text—and

Supreme Court cases interpreting this text—demonstrates that it does not encompass possession of firearms by felons.

**B.      Section 922(g)(1) Is Consistent With This Nation's Historical Traditions**

Even if this Court were to conclude that the Second Amendment covers felons' possession of firearms, Eason still cannot prevail because § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. In reviewing history, courts must primarily consider "English history dating from the 1600s, along with American colonial views leading up to the founding." *Ibid.* As explained below, this analysis shows that § 922(g)(1) is analogous to (a) laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms; and (b) laws authorizing capital punishment and estate forfeiture for felonies.

**1.      Section 922(g)(1) is analogous to historical firearm disqualification laws**

By 1791, legislatures had an established tradition of exercising broad authority to disqualify categories of people from possessing firearms based on a judgment that these groups could not be trusted to adhere to the rule of law. England had long disarmed classes of people who, in the legislature's view, could not be relied upon to obey the rule of law. In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688); *see also Jackson*, 69 F.4th at 502. This statute reflected the new government's perception that Catholics who refused to renounce their faith could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. The prohibition was not based on a theory that all Catholics were dangerous, *id.* at 121 (Krause, J., dissenting); the concern was with a group's disobeying the

11

sovereign. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm*, *supra*, at 72. *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.).

In her oft-cited dissent in *Kanter v. Barr*, 919 F.3d 437, 547 (7th Cir. 2019), then-Judge Barrett likewise observed that Parliament disarmed Catholics in part because the Protestant majority found them "untrustworthy." *Id.* at 457 (citation omitted). A focus on untrustworthiness, rather than danger, has other historical roots. For instance, "following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (i.e., non-Anglican) Protestants," including even pacifist Quakers. *Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources); s*ee also Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents …were violent or dangerous persons").

These examples are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to the Second Amendment. *Bruen*, 142 S. Ct. at 2141; *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). The English Bill of Rights specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142. And yet when they first formally claimed that right, they ensured that Parliament retained the power to disarm part of the population based on concerns that this part would not abide by the law. *See Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting).

12

The colonies inherited this tradition. Firearm regulations directed toward disarming Native Americans and black people were pervasive.[1] *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting). The colonies also disarmed full-fledged members of the political community—*i.e.,* free Christian white men—"whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th at 122 (Krause, J., dissenting). "Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* (citation omitted).

Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (collecting sources). During the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to

---

[1] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g., Laws and Ordinances of New Netherland, 1638-1674,* at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801,* at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773,* at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801,* at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799,* at 153-55 (1800) (1768 Ga. Law); *see also Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes").

take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law).

Throughout the Revolutionary War, American legislatures passed disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government. A 1775 Connecticut law provided that any person convicted of "libel[ing] or defam[ing]" acts of the Continental Congress or Connecticut General Assembly "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended colonies disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments' war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six colonies enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503; *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting).

A common feature of these laws was to require loyalty oaths and strip anyone who failed to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-

82. This often resulted in forfeiture of additional political rights, including the rights to vote, serve on juries, and hold public office. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282. The Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 69 F.4th at 125 (Krause, J., dissenting). That law is also particularly informative because the year before enacting it, Pennsylvania adopted a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014).

The history behind the Second Amendment's adoption provides additional persuasive evidence that the Founders understood the individual right to bear arms to be compatible. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the. . .debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Their principal objections were ultimately vindicated four years later through the adoption of eight amendments—including the Second Amendment—first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated: "no law shall be passed for disarming the people or any of them unless for crimes committed, *or* real danger of public injury from individuals." *Id.* at 665 (emphasis added). The Founders recognized that "crimes committed," violent or not, can supply an independent ground for a legislature to prohibit

15

firearm possession. "The use of the word 'or'" in this proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158-59.

Similarly, at the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress. . .to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And the New Hampshire convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals also recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

To be sure, the Second Amendment's language and these proposals are not identical. But it would have been "obvious" to the founders that certain groups, including "the felon," from Cooley, *supra*, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during debates because this limitation "was understood"). The absence of meaningful founding-era "disputes regarding the lawfulness" of such regulations disarming criminals permits courts to "assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen,* 142 S. Ct. at 2133.

### 2.    Section 922(g)(1) is analogous to felony punishment laws

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were commonly authorized punishments in the American colonies. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late 18th century and "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) punished by death many felonies, including treason, murder on federal land, piracy on the high seas, and forging or counterfeiting a public security. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). States in the early Republic likewise capitally punished "nonviolent crimes such as forgery and horse theft." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18. Many American jurisdictions through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

American colonies punished a variety of crimes with death, estate forfeiture, or both. A 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's

17

house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and seven years' imprisonment. *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767). A 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878). Similarly, in 1777, Virginia adopted a law stating that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes." 9 *The Statutes at Large;*

*Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 Va. forgery law). In 1788, New York passed a law providing for the death penalty for crimes including counterfeiting, burglary, robbery, arson, and malicious maiming and wounding. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *see also Jackson*, 69 F.4th at 503; *Range*, 69 F.4th at 126-27 (Krause, J., dissenting). Put another way: "The framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." *See* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Thus, "tradition and history" show "those convicted of felonies are not among those entitled to possess arms." *Medina*, 913 F.3d at 158, 160.

The dissent in *Kanter* resisted this analysis, concluding that "[t]he upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the government suggests." 919 F.3d at 461. At the same time, it recognized, "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." *Id.* at 462 (citing Cooley, *supra*). In other words, even a contrary point of view recognizes a form of "civil death" that resulted from committing a felony. *Id.* at 458. Although the *Kanter* dissent tries to divorce "civil death" from disarmament, the majority in *Kanter* did not agree with that view. *Id.* at 462. The dissent also did not anticipate the Supreme Court's tying the Second Amendment's protections to "ordinary, law-abiding, adult

citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580. Even the consequence of mere "civil death," in other words, is enough to demonstrate that the Amendment does not protect felons' possession of firearms.

## C.    Summary

To respond to the questions *Atkinson* posed, 70 F.4th at 1023-24: *First*, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" because it disarms individuals who, like felons, are untrustworthy adherents to the rule of law.

*Second*, history teaches that (1) across relevant eras, legislatures categorically disarmed groups they feared would disregard the law and disturb the social order; (2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of disarming criminals; and (3) at English common law and in early American law, convicted felons were subject to capital punishment, estate forfeiture, and "civil death," demonstrating that firearms dispossession was subsumed within those greater punishments and the expulsion of felons from the political community. These regulations were pervasive, and their underlying rationales, like § 922(g)(1), prioritized social order and respect for the law over a pre-existing right to self-defense. *See Jackson*, 69 F.4th at 504-05 (explaining § 922(g)(1) aims to disarm those deemed "potentially irresponsible" and prevent "lawlessness").

*Third*, although the government has emphasized the historical rationale for disarming groups perceived as a threat to the social order, a historical rationale for disarmament based on danger supplies another helpful analogue. *See, e.g., Jackson*, 69 F.4th at 502-05 ("[E]ither reading supports the constitutionality of § 922(g)(1).").

A dangerousness-rooted historical rationale for disarmament supports the validity of § 922(g)(1), as applied to all felons. As *Jackson* explained, "[l]egislatures historically

20

prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 504. As *Kanter* explained, "prohibiting even nonviolent felons. . .from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists "between nonviolent offenders. . .and a risk of future violent crime." 919 F.3d at 448. Again in *Yancey*, the Seventh Circuit explained that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. *See also Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008).

*Fourth*, these analogous laws supply enough of a historical tradition to support § 922(g)(1)'s constitutionality. Far from "isolated instances of regulation," *Atkinson*, 70 F.4th at 1024, they are rooted in English common law and were adopted across the colonies.

**D.    Defendant's As-Applied Challenge Therefore Fails.**

The Defendant's as-applied challenge to § 922(g) should be rejected. The Seventh Circuit has "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter*, 919 F.3d at 443. Certainly, *Kanter* "left room for as-applied challenges" to Section 922(g). 919 F.3d at 443 (*citing Williams*, 616 F.3d at 693). But, to date, the Seventh Circuit has accepted none.

There is no question here that Eason is a convicted felon, that is, a non-law-abiding citizen not covered by the Second Amendment and subject to firearms regulations consistent with this nation's historical tradition. Eason has proffered no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on an individualized assessment. This is a flaw that the *Atkinson* panel majority also noted. 70 F.4th at 1023 ("[Atkinson] does

not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes"). Instead, as detailed above, the historical tradition supports the legislature's ability to disarm *categories* or groups. *United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) (reaffirming *Jackson* and stating that there is "no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"); *Jackson*, 69 F.4th at 504; *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("The Second Amendment permits categorical regulation of gun possession. . .rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (history "support[s] the proposition that the state can take the right to bear arms away from a category of people it deems dangerous" and "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"). The relevant question, in other words, is whether the prior felony is the kind that ordinarily indicates that the person cannot be trusted to use a gun responsibly, not whether everyone who commits the crime is necessarily dangerous or violent.[2]

Eason has been convicted of serious felony crimes.  He was convicted of Intimidation in which he communicated a threat to another individual while armed with a deadly weapon,

---

[2] Individualized assessments could also yield wildly disparate results. *See, e.g.*, *Atkinson*, 70 F.4th at 1026-27 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could imagine"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). In the criminal context, in particular, the opportunity for pretrial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)).

and Strangulation, a crime of violence. (Govt. Exhibit A).  Of note, his current case began with a 911 call in which a woman reported that her boyfriend, Eason, battered her and then armed himself with a handgun, threatened to kill her and pointed the handgun at her.  She escaped from a window after he passed out and went to a gas station to call the police for help.  There is no question therefore that Eason is among the class of individuals constitutionally prohibited from possessing firearms under § 922(g)(1) and that the government has cited a substantial history justifying disarmament of dangerous individuals who have been found to be untrustworthy with weapons.  The Court should deny this as-applied challenge.

### III.  CONCLUSION

For the reasons stated above, the Court should deny Eason's motion to dismiss.

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY

STACEY SPEITH
Digitally signed by
STACEY SPEITH
Date: 2024.01.02
08:44:42 -05'00'

By:   Stacey R. Speith
Assistant United States Attorney
E. Ross Adair Federal Bldg.
& U.S. Courthouse
1300 S. Harrison Street, Room 3128
Fort Wayne, IN 46802-3489
Telephone:  (260) 422-2595
Facsimile:   (260) 426-1616
E-mail Address: stacey.speith@usdoj.gov