UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cause No. 1:22-CR-65-HAB |
| | ) |
| JONATHON B. EASON | ) |

**OPINION AND ORDER**

Defendant was charged in a one-count indictment for violating 18 U.S.C. § 922(g)(1). He now moves to dismiss the indictment, arguing that § 922(g)(1) is unconstitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Defendant also argues that the statute is unconstitutionally vague. The motion is now fully briefed (ECF Nos. 27, 29[1]) and ready for ruling.

**I.      Factual Background**

The indictment charges that Defendant knowingly possessed a firearm after previously being convicted of two Indiana state-law felonies: Intimidation, a Level 5 felony, and Strangulation, a Level 6 felony. (ECF No. 1 at 1). Both convictions, handed down in September 2021, are from a single domestic violence incident. (*Id*.; ECF No. 29-1).

**II.     Legal Discussion**

**A.      *The* Bruen *Test for Constitutionality***

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees the right of "law-

---

[1] Defendant had a chance to submit a reply in support of his motion. (ECF No. 30). No reply was filed.

abiding, responsible citizens" to keep and bear arms for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

In *Bruen*, the Supreme Court announced a new test for analyzing the constitutionality of firearm restrictions. 142 S. Ct. at 2127. First, courts must determine whether the "Second Amendment's plain text covers an individual's conduct." *Id*. at 2129–30. If so, the Constitution presumptively protects that conduct and the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126. Only then may the Court conclude that the "individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (citing *Konigsberg v. State Bar of Cal*., 366 U.S. 36, 50 n.10 (1961)).

The Seventh Circuit clarified the analysis demanded by *Bruen*'s text-and-history test in considering whether Section 922(g)(1) is constitutional. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Atkinson* explained that the government could successfully defend modern-day arms regulations—especially those "unimaginable at the founding"—by analogy. *Id*. at 1021. The Seventh Circuit made clear that the government need not "pinpoint a dead ringer—a well-established and representative historical analogue will do." *Id*. That said, pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import[,]" would not suffice. *Id*. at 1022. As further guidance, the Seventh Circuit proposed a set of "interrelated and non-exhaustive questions [that] may help focus the proper analysis":

> 1. Does [Section 922(g)(1)] address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?" *Id*.
>
> 2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional

2

>    ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction[s] imposed by [Section 922(g)(1)]. To answer the question, . . . the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against [Section 922(g)(1)].
>
>    3. Are there broader historical analogues to [Section 922(g)(1)] during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to [Section 922(g)(1)].
>
>    4. If the [parties'] historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support [Section 922(g)(1)]? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.
>
>    5. If history supports [a defendant's] call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 1023–24.

**B.      *Defendant is Among the "People" Protected by the Second Amendment***

The parties first dispute whether Defendant, a felon, is among the "people" protected by the Second Amendment. This argument tracks the current state of *Bruen*-related litigation. The Government argues that felons are not protected individuals, noting repeated references in *Heller* and *Bruen* to "law abiding, responsible citizens." (ECF No. 29 at 9-10). Defendant challenges the idea that these references impose a blanket exclusion from the protections of the Second

3

Amendment, relying largely on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).

The Court believes that, although pre-*Bruen*, the Seventh Circuit's most recent pronouncement on the scope of the Second Amendment supports Defendant's position. In *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), the Seventh Circuit held that unauthorized, non-U.S. citizens were within the "people" protected by the Second Amendment. *Id*. at 669-72. Reasoning that "people" must be given the same definition when used throughout the Bill of Rights, the Seventh Circuit relied on Fourth Amendment cases to hold that a person need only have "developed substantial connections with this country" to enjoy Constitutional protections. *Id*. at 672 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). In so holding, the court rejected the Government's argument that the defendant's criminal past exempted him from Second Amendment protections, stating that the "Second Amendment is not limited to such on-again, off-again protection." *Id*. at 671.

The Court finds it likely that, when asked to apply the *Bruen* analysis, the Seventh Circuit would find that more is required than just a "substantial connection" to the country for a defendant to enjoy Second Amendment protections. And it's true that the Seventh Circuit, in *Atkinson*, highlighted that *Meza-Rodriguez* was decided pre-*Bruen*. *Atkinson*, 70 F.4th at 1023 ("Although we analyzed the scope of the Second Amendment right before *Bruen*, we have not returned to the issue since then."). But the point remains that *Atkinson* did not disturb *Meza-Rodriguez*'s holding. And *Bruen* provides almost no guidance on how district courts are to answer this question. So the Court concludes that, at least for now, *Meza-Rodriguez* describes what is necessary and sufficient to fall within the scope of the Second Amendment.

4

Given this conclusion, the Court must find that Defendant falls within the protections of the Second Amendment. The defendant in *Meza-Rodriguez* was charged with a violation of 18 U.S.C. § 922(g)(5), which prohibits "unauthorized aliens" from possessing firearms. 798 F.3d at 666. Illegal entry into the United States carries with it the potential of two years' imprisonment, 8 U.S.C. § 1325(a)(1), a felony penalty to be sure. If that defendant remained among the "People" despite his status and prior illegal conduct, the Court sees no reason why Defendant would not. Defendant has satisfied the first part of the *Bruen* test, so the burden now shifts to the Government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

C. *The Nation's Historical Tradition of Firearm Regulation Supports the Constitutionality of § 922(g)(1) as Applied to Defendant*

To satisfy its burden, the Government points to four broad categories of 17th and 18th century laws: (1) laws disqualifying Catholics from firearm possession; (2) laws disqualifying certain ethnic minorities from firearm possession; (3) laws disqualifying "disloyal" citizens from firearm possession; and (4) laws imposing capital punishment and asset forfeiture on felons. The Court will address each in turn.

But first! The astute reader will note that the list above does not contain "laws disqualifying felons from firearm possession." The Court takes this as a concession by the Government that there were no revolutionary-era laws that match § 922(g)(1). *Bruen*, however, requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in original). In other words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. So the Court must turn to the Government's historical analogues.

5

The four categories of law advanced by the Government here are the same as those analyzed by the Northern District of Illinois in *United States v. Griffin*, --- F. Supp. 3d ---, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023). The Court finds Judge Johnson Coleman's reasoning compelling and will borrow much of it here.

For laws disqualifying Catholics, Judge Johnson Coleman reasoned:

> The core question is whether felon dispossession law and the historical analogue cited by the government "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133. Here, the early English government enacted these laws solely for discriminatory reasons that would be impermissible today. Thus, the Court finds that the law cannot impose a "comparably justified" burden on the right of armed self-defense. Accordingly, the Court declines to use discriminatory laws based on religion as a foundation for denying Second Amendment rights.

*Id*. at *5. The Court agrees. Unless the Government's argument is that § 922(g)(1) is based on religious bigotry, the Court struggles to find religion-based prohibitions "comparable" to felon-based prohibitions.

Judge Johnson Coleman was even less receptive to laws disqualifying Native Americans and Black people.

> The Court is dismayed by the government's continuous reliance on admittedly bigoted and racist laws in these cases. Indeed, the Court would be remiss in failing to point out that the government's characterization of Griffin, a Black man, as an "untrustworthy adherent to the law" would have been the same characterization the founders had about the enslaved Africans. The government essentially expands on *Bruen*'s test to argue that the denial of all constitutional rights at the founding can justify the denial of some constitutional rights today. The government should be careful in picking its friends out of history's crowd.

\* \* \* \*

> Unsurprisingly, this Court rejects the government's reliance on slavery and discrimination toward Native Americans as historical analogues to Section 922(g)(1) given the regulations impermissible premise cannot impose a "comparably justified" burden on the right of armed self-defense. Accordingly, the Court finds that Section 922(g)(1) is not analogous to discriminatory regulations regarding slavery and Native Americans.

6

*Id*. at *6 (quotations and citations omitted). For the same reasons the Court rejects as analogous laws based on religious bigotry, it rejects those based on racial bigotry.[2]

Judge Johnson Coleman further rejected as analogous colonial-era laws imposing the death penalty and estate forfeiture for felony offenses.

> This Court sees no comparison and strongly disagrees that the authority to impose the death penalty implies a lesser right to disregard the fundamental rights of felons. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) ("founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed."). Accordingly, the Court finds that this argument fails.

*Id*. at *8. Again, the Court agrees with this assessment.

But not all is lost for the Government. Judge Johnson Coleman found laws disqualifying British loyalist as analogous to § 922(g)(1).

> The Court does find that the laws disarming British loyalists are a proper historical analogue. The historical record supports a finding that legislatures categorically disarmed individuals who they feared would disregard the law and disturb the social order. The Court finds that a historical rationale exists for disarmament based on perceived danger. Although these predecessors do not apply specifically to felons, *Bruen* clarifies that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133.
>
> Griffin critiques the British loyalist dispossession laws as dissimilar to Section 922(g)(1). Griffin claims that Section 922(g)(1) is a total and permanent ban on firearm ownership, with no exceptions while British loyalists could carry firearms

---

[2] But the Court does not fault the Government as Judge Johnson Coleman did. This is the deal the Supreme Court struck in *Bruen*. By tying the entire universe of permissible firearm regulations to the sensibilities of 18th Century, landowning, single-shot-musket-wielding white men, the Supreme Court bought a Superfund site of outdated beliefs. Buried beneath the legal genius that drafted the Constitution was a layer of racism, sexism, and religious bigotry that would put many of the Founders on the most extreme edges of modern society. That the Government is forced to wrap itself in laws produced by the odious societal standards of the powdered wig-wearing past is not a bug of *Bruen*, at least in the minds of its majority, but a feature. It is the natural and probable consequence of the Supreme Court's standard. Judge Johnson Coleman is right to take offense but directing her ire at the Assistant United States Attorneys, who are doing little more than *exactly what the Supreme Court requires*, is pointless punching down.

> if they signed a loyalty oath. Because the government's analogue contains exceptions allowing "untrustworthy adherents to the law" to possess firearms, Griffin argues that Section 922(g)(1) cannot "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.
>
> The Court rejects Griffin's characterization of Section 922(g)(1) as having no exceptions. In fact, felons may regain their right to possess firearms if they were pardoned or their conviction was expunged. The statutory scheme also leaves open the possibility for felons to seek administrative relief and regain their right to bear arms. These exceptions demonstrate that Section 922(g)(1) imposes a "comparable burden" on the right to bear arms as the British loyalist historical analogue as required by *Bruen*, 142 S. Ct. at 2133. Accordingly, the British loyalist dispossession laws are a proper historical analogue to Section 922(g)(1).

*Id*. at *7 (citations omitted). The Court agrees. Unlike the Government's other proposed analogues, loyalty-based regulations are not premised on naked bigotry, and echo many of the concerns used to disqualify felons now—fears of danger and an inability to follow the law. Laws disqualifying British loyalists are a proper historical analogue to § 922(g)(1).

But just as those laws allowed for an individualized assessment by reinstating the right to carry a firearm to those who signed loyalty oaths, so too must § 922(g)(1). *Id*. at *8 ("Thus, to the extent the exception shows that some British loyalists were permitted to carry firearms despite the general prohibition, the Court interprets this history as supporting an individualized assessment under the analogue and therefore under Section 922(g)(1)."). The question, then, becomes whether Defendant is properly categorized as "untrustworthy" or "dangerous."

And this is where it all falls down for Defendant. One of Defendant's disqualifying felony convictions was for Strangulation under Ind. Code § 35-42-2-9. That statute requires, as an element of the offense, the intentional application of pressure to the throat or neck "in a manner that impedes the normal breathing or the blood circulation of the other person." *Id*. at (c)(1). Defendant's second disqualifying felony conviction was for Intimidation as a Level 5 felony under Ind. Code § 35-45-2-1(b)(2). That statute requires, as an element of the offense, the communication

8

of a threat during which "the person draws or uses a deadly weapon." *Id*. at (b)(2)(A). And, as noted above, these convictions are less than three years old.

What the Court is left with, then, is an individual with recent, violent felony convictions involving a deadly weapon. He is precisely the type of "untrustworthy" and "dangerous" person that our country has long prohibited from possessing firearms. The Court can conceive of no reasoned interpretation of the Second Amendment that would permit a person like Defendant to possess a gun. His as-applied challenge to § 922(g)(1) is rejected.[3]

**D.**     *§ 922(g)(1) is not Unconstitutionally Vague*

On top of a *Bruen* challenge, Defendant argues that § 922(g)(1) is unconstitutionally vague under the Fifth Amendment. His argument focuses not on the language of the statute, but on the uncertainty caused by *Bruen*. Defendant reasons that, because *Bruen* threw open the gates for constitutional challenges to virtually every firearm regulation, no one can know who and what is prohibited without the kind of "fulsome" historical analysis required by the Supreme Court.

The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Products Corp*., 372 U.S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co*., 255 U.S. 81, 89 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

---

[3] Because the Court finds § 922(g)(1) constitutional under Defendant's specific circumstances, it need not consider a facial challenge to the statute. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge to a statute "must establish that no set of circumstances exists under which the Act would be valid").

standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Defendant's argument is creative, but it's not how vagueness is determined. The test for vagueness is whether the statutory "**language** conveys sufficiently dangerous warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. DeGeorge*, 341 U.S. 223, 231 (1951) (emphasis added). The Court can find no case, and Defendant has not identified one, where a later judicial interpretation of a related Constitutional amendment rendered plain statutory language vague. This Court is not eager to be first in that line.

Defendant effectively concedes that the language of § 922(g)(1) is clear and unambiguous. (ECF No. 27 at 24) (Defendant "is not arguing that whether he, nor any firearm possessor, knew or not that his conduct violated § 922(g)(1) supports a finding of vagueness"). A wise concession since there is nothing ambiguous about a statute prohibiting possession of a firearm by any person "who has been convicted in any court of, a crime punishable by imprisonment of a term exceeding one year." 18 U.S.C. § 922(g)(1). The statute is not unconstitutionally vague, *see United States v. Sherls*, Case No. 2:22-CR-13-JD, 2023 WL 8185665, at *4-5 (N.D. Ind. Nov. 27, 2023), and Defendant's Fifth Amendment challenge is rejected.

### III. Conclusion

For these reasons, Defendant's motion to dismiss (ECF No. 27) is DENIED.

SO ORDERED on February 15, 2024.

        s/ *Holly A. Brady*
        CHIEF JUDGE HOLLY A. BRADY
        UNITED STATES DISTRICT COURT